## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 3169 |
| | ) | |
| JAMES Y. SAPORITO and | ) | Judge Rebecca R. Pallmeyer |
| PAUL CARR, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Beginning in December 2003, the United States spent $1.5 million to clean up hazardous substances at a site on the northwest side of Chicago where the Crescent Plating Works once operated.  In this lawsuit under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), the government seeks to recover these funds from Defendants James Saporito and Paul Carr.  According to the government, Saporito ran the operation from 1997 to 1999 and again from 2001 to 2003 when he was also an owner, and Carr was responsible for the day-to-day operations from 2000 to 2003.   The government has reached a settlement agreement with Carr.  Saporito, the only remaining defendant, has filed six counterclaims, and both sides have moved for summary judgment.  For the reasons explained here, the court grants the government's motion to dismiss Saporito's counterclaims and enters summary judgment in favor of the government.

## FACTUAL BACKGROUND

**Preliminary Matters**

The court has had no small amount of difficulty determining what facts are truly in dispute due to the 236 pages worth of filings—not counting exhibits—the parties have submitted on the matter.  Defendant's Reply to Plaintiff's 56.1(b)(3) Response to Defendant's 56.1(a)(3) Statement, Dkt. 123, is by itself 110 pages long.  Many of those pages, as well as the 50 pages of Defendant's

56.1(b)(3) Response to Plaintiff's 56.1(a)(3) Statement, Dkt. 111, are taken up with repeating a handful of objections, which, for the reasons explained here, must be overruled.

First, Defendant argues that the government may not rely on EPA Pollution Reports and EPA Action Memorandum because they are inadmissible hearsay. (Def's Response to Pl's 56.1(b)(3), Dkt. 111, ¶¶ 3-4, 14, 51, 64-70; Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, ¶ 28.) Under Federal Rule of Evidence 803(8), however, public records and reports are not excluded by the hearsay rule. That exception applies to the reports in question, *e.g., O'Dell v. Hercules, Inc.,* 904 F.2d 1194, 1206 (8th Cir. 1990), and Defendant does not attempt to argue otherwise.

Defendant also seeks to exclude the EPA documents and a declaration by an EPA employee on the grounds that those documents contain opinion testimony that was not disclosed in accordance with the scheduling order. (Def's Memo in Opposition, Dkt. 110, at 1 n.1, 6; Def's 56.1(b)(3) Response to Pl's 56.1(a)(3), Dkt. 111, ¶¶ 38, 39; Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, ¶¶ 24, 28, 37, 42, Supp ¶¶ 42, 44, 45.) The authors of the declaration and the EPA documents were on hand for the EPA's cleanup of Crescent Plating, so their recounting of the evidence is based on first-hand observations. Thus, the evidence is admissible under Federal Rule of Evidence 701 and the government was not required to make disclosures pursuant to Federal Rule of Civil Procedure 26(a)(2).

When he is not arguing that evidence based on personal knowledge is inadmissible expert testimony, Defendant argues the reverse: that statements by Frank Altmayer, an expert for the government, are not admissible because Altmayer has not been shown to have personal knowledge of the subject of that testimony. (Def's Response to Pl's 56.1(b)(3), Dkt. 111, ¶¶ 4-5, 7-8, 14-15, 17, 19-20, 38-39; Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, Supp. ¶¶ 14-16, 20, 22-23, 53.) This objection, too, is overruled; as an expert witness, Altmayer need not have personal knowledge of the subject about which he testifies. FED. R. EVID. 703.

Finally, Defendant argues repeatedly that certain statements by Altmayer cannot be relied on because they were not timely disclosed in his expert report. (Def's Response to Pl's 56.1(b)(3), Dkt. 111, ¶¶ 5-8, 14-15, 17, 19-20, 26, 38-39, 55; Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, Supp. ¶¶ 14-16, 20, 22-23.) As the court understands this argument, it is no more than a technical complaint: the government's 56.1(a)(3) statement cites to a declaration submitted by Altmayer in support of the government's motion for summary judgment rather than to Altmayer's expert report. That report was timely disclosed. Defendant complains that the exact phrases used in the 56.1(a)(3) statement and Altmayer's declaration are not found in Altmayer's expert report, but he never argues that one of those phrases is not *supported* by the report. It may have been preferable for the government's statement to cite to the report or for Altmayer's declaration itself to cite to the report, but Defendant has not pointed to anything in the statement or declaration that is either contradicted by or not supported by the report.

### 1. Undisputed Facts

#### a. Crescent Plating's Operation

Beginning in the 1970s, Crescent Plating operated a facility on the northwest side of Chicago that plated steel and brass objects with various metals such as zinc, chromium, and copper. (Pl's 56.1(b)(3), Dkt. 87, ¶¶ 3-4.) In addition to those metals, the plating process also used, among other potentially hazardous chemical, sodium cyanide, hexavalent chromium, and trichloroethene. (*Id.* ¶¶ 5, 7.) Very simply explained, the electroplating process involves dipping the item to be plated into a series of chemical baths through which electrical current is run. (*Id.* ¶¶ 6, 8.) Crescent Plating had at least two different plating lines each made up of a series of baths. (*Id.* ¶¶ 9-10.) When items are moved from one bath to another, some dripping of the plating solution onto the floor is inevitable. (*Id.* ¶¶ 16-17.) The floor at Crescent Plating was bare concrete; although waste from spills was routed through trenches to a pit lined with polypropylene to be cleaned up, those trenches were also bare concrete. (*Id.* ¶¶ 12, 19.) Highly acidic plating

chemicals can corrode concrete.  (*Id.* ¶ 20.)

The electrical current needed for the plating process comes from a device called a rectifier that converts alternating current to direct current.  (Pl's 56.1(b)(3), Dkt. 87, ¶ 6.)  Altmayer, the government's expert witness, describes the rectifier as a necessary part of the process, (*id.*), but Defendant claims that his expert witness, Gerald Albert Krulik, disputes that description of a rectifier.  (Def's 56.1(b)(3) Response to Pl's 56.1(a)(3), Dkt. 111, ¶ 6.)  In fact, Krulik nowhere states that electroplating can be performed without a rectifier; he adds only that a rectifier has many uses aside from electroplating—every laptop needs one, for example, in order to charge its battery—and that the rectifier is not capable of producing hazardous waste on its own.  (*Id.*)  The government does not dispute these facts.  (Pl's Reply to Def's 56.1(b)(3) Response to Pl's 56.1(a)(3), Dkt. 121, at 5-6.)

To dispose of plating solutions, Crescent Plating pumped the waste through pipes to the facility's wastewater treatment area.  (Pl's 56.1(b)(3), Dkt. 87, ¶¶ 12-13.)  The waste was then treated with various chemicals before being poured into a 60,000 gallon clarifier, a large tank that relies on gravity to separate water from precipitated metals as the waste settles.  (*Id.* ¶ 14.)  The clarifier produced some waste that, under the Clean Water Act and local regulations, was permissibly disposed of into the sewer, but the clarifier also produced sludge that was routed to a 2,025-gallon tank.  (*Id.* ¶ 15.)  Water was removed from the sludge in a filter press and the remaining "cakes" of dewatered sludge were placed in a bin located outside the building for proper disposal offsite.  (*Id.*)

### b.    Defendant's Involvement with Crescent Plating

From as early as 1974, Crescent Plating was owned and run by Donald Saporito, Defendant's cousin.  (Def's 56.1(a)(3), Dkt. 93, ¶ 5.)  Paul Carr began working there in 1979 and worked his way up to plant manager in 1997, vice president in 1999, and president in 2000.  (Pl's 56.1(a)(3), Dkt. 87, ¶ 22-27.)  Defendant testified that he became involved in Crescent Plating in

1997 when he loaned $100,000 to his cousin. (Def's 56.1(a)(3), Dkt. 93, ¶ 9.) Although Defendant describes the transaction as a loan, the government has submitted a signed Bill of Sale reflecting that the transaction was a purchase. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, ¶ 9, Ex. 3.) In addition, a Crescent Plating employee stated that Defendant told her he had bought the operation.[1] (*Id.* ¶ 9.) Notwithstanding whether the deal involved a purchase or a loan, Defendant does not dispute that he held the title of Vice President at Crescent Plating between 1997 and 1999 and had some responsibilities at the company during that time period. (Pl's 56.1(a)(3), Dkt. 87, ¶ 28, 30.) Although documents show that Defendant had signatory authority for Crescent Plating's operations, that he was responsible for plant maintenance, and that he had responsibility for environmental regulatory paperwork, Defendant has disputed that evidence, questioning the authenticity of his signature on documents where it appears. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, ¶ 10; Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, ¶ 10.) In 1999, Donald Saporito terminated Defendant from Crescent Plating's employ. (Def's 56.1(a)(3), Dkt. 93, ¶ 10.)

Some time after his termination—the exact date is not in the record—Defendant sued Crescent Plating and Donald Saporito in state court. The third amended complaint in that litigation, a copy of which is in the record, alleges that Defendant purchased Crescent Plating and does not refer to a loan. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, ¶ 9, Ex. 8.) The complaint also asserts that Defendant "at all times relevant possessed complete control over the operation and management" of Crescent Plating. (*Id.*, Ex. 8 ¶ 19.) Presumably, "all times relevant" refers to the time between the 1997 loan/sale and Defendant's 1999 termination.

Donald Saporito died before the case could be resolved and before the purported loan could

---

[1] Defendant contends that the employee's statement is inadmissible hearsay, but he apparently overlooked Federal Rule of Evidence 801(d)(2)(A), which provides that a party's own statement offered against the party is not hearsay.

be repaid, but Defendant reached a settlement agreement with Carr, Crescent Plating, and Donald Saporito's estate in 2002. (Def's 56.1(a)(3), Dkt. 93, ¶ 10.) That agreement, a copy of which is in the record, seems to reflect yet another possibility for Defendant's role at Crescent Plating between 1997 and 1999. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, ¶ 7, Ex. 2.) In the agreement, the parties stated that Donald Saporito was "the owner of all of the issued shares of stock of Crescent," and that Defendant had alleged that he had an agreement with Donald Saporito to purchase the stock on or after Saporito's death for a "sum certain previously paid." (*Id.*, Ex. 2.) To settle their dispute, the parties agreed that the estate would transfer its interest in the Crescent Plating property to Defendant and Carr, jointly, in exchange for $35,000, of which $10,000 had already been paid. (*Id.*) Defendant and Carr never made the $25,000 payment, though, because the property was seized for failure to pay property taxes. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, ¶ 10.) It was sold in a tax sale in December 2003. (*Id.* ¶ 7.) To settle any potential claim of ownership that Defendant or Carr might assert, the buyer in the tax sale paid Defendant about $70,000. (*Id.* ¶ 7, Ex. 1, Saporito Dep., at 225.) Defendant testified that he shared some of that payment with Carr, but did not say how much. (*Id.*, Ex. 1, Saporito Dep., at 225.)

In 2001, while Defendant's case against his cousin's estate was ongoing, Defendant made an agreement with Carr, who was acting on behalf of Crescent Plating. In the agreement, Defendant acquired various pieces of equipment used by Crescent Plating, which he then leased back to the company. (Pl's 56.1(a)(3), Dkt. 87, ¶¶ 31, 35-36.) The equipment included 14 rectifiers, a 2-ton filter press, boilers, computers, and a semi-truck and trailer. (*Id.* ¶ 35.) The bill of sale, a copy of which is in the record, is signed by Paul Carr, who is identified as President of Crescent Plating and "seller," and by Defendant, who is identified as "buyer." (*Id.*, Ex. 25.) Although the bill of sale records a payment of $10,000, Defendant testified that he paid an additional $30,000 to $40,000 for the equipment over time. (*Id.*, Ex. 25, Ex. 2, Saporito Dep., at 233-34.) Defendant

described that additional amount as payment for the equipment but also as payments to cover Crescent Plating's bills to keep the company running. (*Id.*) Defendant testified that the equipment he owned was the "heartbeat" of Crescent Plating's business. (*Id.*, Ex. 22, Saporito Dep., at 435.) In a document filed several months after the deposition, Defendant explained that he had not intended to offer an opinion on the importance of his equipment to the plating operation, but only on the equipment's importance to him through its earning power. (Def's Memo in Opposition, Dkt. 110, Ex. 1 ¶ 13.)

### c.    Release of Waste

Since at least 1997, Crescent Plating has had to deal with several complaints about releases of hazardous waste. (Pl's 56.1(a)(3), Dkt. 87, ¶¶ 40-47.) In 1997, occupants of a neighboring building complained about a black liquid with a chemical smell seeping through their basement wall. (*Id.* ¶¶ 40, 51.) After the complaint, an investigator for the Chicago Department of Environment ("DOE") observed spillage and leakage on one of Crescent Plating's lines. (*Id.* ¶ 40) He also observed that the building's concrete floor was so badly cracked that the soil below it was visible. (*Id.*) His observations about the floor are disputed: Carr testified that the floor was not cracked because any cracks were promptly repaired. (Def's 56.1(b)(3) Response to Pl's 56.1(a)(3), Dkt. 111, ¶ 40; Pl's 56.1(a)(3), Dkt. 87, Ex. 5, Carr Dep., at 138-39.) In March 2001, an inspector from the Metropolitan Water Reclamation District of Greater Chicago ("MWRD") observed that, due to a broken pipe, a six-inch deep pool of wastewater had formed on the floor. (Pl's 56.1(a)(3), Dkt. 87, ¶ 41.) In April 2002, the same inspector found another broken pipe from which liquid from the plating lines was running onto the floor. (*Id.* ¶ 43.) In 2002, the new owners of the neighboring building complained about seepage, which a DOE investigator noted appeared identical in color to chromic acid on the floor of the Crescent Plating facility. (*Id.* ¶ 52.) The government's expert concluded that hazardous substances detected in soil samples below that building likely migrated from Crescent Plating. (*Id.* ¶ 60.) Defendant attempts to dispute the expert's conclusion by relying

on statements made by his own expert that some of the chemicals found in the soil may have come from other sources. (Def's 56.1(b)(3) Response to Pl's 56.1(a)(3), Dkt. 111, ¶¶ 55, 60.)

On at least three occasions in 2003, inspectors from the Chicago DOE and the MWRD visited the Crescent Plating site and met with Defendant regarding conditions at the site. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, Supp. ¶¶ 8-9.) In July 2003, the Illinois Environmental Protection Agency served Crescent Plating with a Notice of Intent to Pursue Legal Action, alleging violations of the Illinois Environmental Protection Act. (*Id.*, Ex. 42, at 10594-95.) At the request of the Chicago DOE, the EPA assessed the site in October 2003. (Pl's 56.1(a)(3), Dkt. 87, ¶ 61.) EPA discovered large amounts of plating waste that were not being stored properly, and Chicago DOE ordered Crescent Plating to stop operations. (*Id.* ¶¶ 61-62.) Defendant was present at the facility the day it was shut down, and he signed the consent form giving EPA access. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, Supp. ¶ 13, Ex. 44.) In a declaration attached to his memorandum in opposition to Plaintiff's motion for summary judgment, Defendant states that he did not read the one-page document before signing it because he did not believe he had that option. (Def's Memo in Opposition, Dkt. 110, Ex. 1 ¶ 18.) What led him to believe that government officials intended to foreclose the option of reading the document is unexplained.

In December 2003, EPA began its own removal activities at the site and in February 2004, the EPA authorized funding for the removal action based on its determination that the conditions at Crescent Plating presented "an imminent and substantial endangerment to the public health, welfare, and the environment." (Pl's 56.1(a)(3), Dkt. 87, ¶¶ 65, 68.) The first EPA site assessment found 58 vats and tanks and 464 containers holding various liquids and sludges as well as a 20-cubic-yard box filled with plating sludge. (*Id.* ¶ 65.) Some containers had deteriorated and spilled, the building and equipment were coated with plating sludge, and the building had no heat or electricity. (*Id.* ¶¶ 64-67.) During the cleanup, the government found two large areas of concrete

floor that had corroded to expose the soil below. (*Id.* ¶ 67.) In all, the EPA spent more than $1.5 million to clean up tens of thousands of gallons of hazardous liquids and sludge. (*Id.* ¶¶ 69-70, 72.)

After cleaning up the site, the government sued Saporito and Carr to recover the costs incurred. Saporito answered with six counterclaims. Each of the first five counterclaims allege that Saporito is entitled to a declaration that he is not liable under CERCLA based on some infirmity with the government's case. (Answer to Plaintiff's First Amendment Complaint, Dkt. 104, at 30-32.) In Claim Six, Saporito seeks damages based on his claim that the government's seizure of his property was unconstitutional. (*Id.*, at 32-33.) The government has moved to dismiss those claims and for summary judgment against Saporito and Carr. Saporito has moved for summary judgment himself. Carr has not replied to the government's motion for summary judgment, but the government reports that it will shortly file a proposed consent decree resolving Carr's liability. (Pl's Reply Memo in Support, Dkt. 120, at 14, n.15.) Accordingly, the court's ruling is limited to the motion to dismiss Saporito's counterclaims and the motions for summary judgment respecting Saporito's liability.

## ANALYSIS

### A.      Cross Motions for Summary Judgment

Defendant and the government have both moved for summary judgment on the issue of Defendant's liability. The court will grant summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Because the court is considering cross-motions for summary judgment, it construes "facts and inferences therefrom in favor of the party against whom the motion under consideration was made." *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1124 (7th Cir. 2008).

A defendant is liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), if the plaintiff shows that "(1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) the plaintiff has incurred costs in response to the release or threatened release." *Sycamore Indus. Park Associates v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008). The government argues that it can establish each element with undisputed evidence and Defendant argues that undisputed evidence shows that the government cannot establish each element. The parties present arguments on all but the first element; there is no dispute that both the Crescent Plating operation and the plating lines themselves each constitute a "facility" under CERCLA; the first is a "building" and the second is "equipment." 42 U.S.C. § 9601(9)(A). Defendant presents arguments for several defenses to liability as well.

### 1. Responsible Party—Past Operator

CERCLA defines four categories of responsible parties, but only two are at issue here: owners of a facility at the time of the government's response action (current owners) and owners or operators of a facility at the time of disposal of a hazardous substance (past owners or operators). 42 U.S.C. § 9607(a)(1)-(a)(2). Although the government's original complaint generally alleged liability under § 107(a), it specifically alleged only that Defendant was an operator of Crescent Plating at the time of disposal of hazardous substances, i.e., a past operator. (Compl., Dkt. 1, ¶ 65.) The government's First Amended Complaint specifically alleges that Defendant was an owner and operator both at the time of disposal of hazardous substances and at the time of the cleanup, i.e., a past owner and operator and a current owner. (First Amended Compl., Dkt. 103, ¶¶ 63-64.) The government's motion for summary judgment seeks judgment based only on Defendant's status as a current owner. (Pl's Memo in Support, Dkt. 86, at 12-13.)

Defendant argues that the government should not be allowed to rely on a theory of current-owner liability because the complaint gave no notice of the theory and raising it so late was

prejudicial.  (Def's Memo in Opposition, Dkt. 110, at 9-10.)  The court considered and rejected this argument when it allowed the government to amend its complaint, reasoning that there was no undue prejudice to Defendant.  (Order of Aug. 18, 2009, Dkt. 102.)  Defendant argued that the new theory would require extra discovery, and the court granted Defendant leave to pursue additional discovery.  Defendant has not done so, nor has he filed a Rule 56(f) affidavit explaining what additional information he requires.  The court stands by its decision to allow the amendment. Defendant also contends that the theory of liability is untimely under CERCLA's three-year statute of limitations, 42 U.S.C. § 9613(g)(2), but this argument fails even if the theory is treated as a new claim.  The theory of current-owner liability "arose out of the conduct, transaction or occurrence set out—or attempted to be set out—in the original pleading," so it relates back to the date of the original complaint.  FED. R. CIV. P. 15(c)(1)(B).

Thus, the court will consider the government's argument that the undisputed evidence shows that Defendant is a current owner as well as Defendant's argument that undisputed evidence shows that he is not a past operator.  The court begins with Defendant's argument that the government's evidence does not establish that he is a past operator, which CERCLA defines as "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).

CERCLA defines "owner or operator" as "any person owning or operating" a facility.  42 U.S.C. § 9601(20)(A).  The circularity of this definition suggests applying ordinary meaning and its generality suggests relying on the common law.  *United States v. Capital Tax Corp.*, 545 F.3d 525, 530 (7th Cir. 2008).  That is what the Supreme Court did when it explained that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998).  The type of liability at issue in Defendant's motion, past operator liability, also requires that Defendant have

11

been an operator at the time of disposal of hazardous substances. CERCLA § 101(29), 42 U.S.C. § 9601(29), adopts the Solid Waste Disposal Act's definition of disposal:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

Defendant argues that uncontested evidence shows he was never an "operator." (Def's Memo in Support, Dkt. 92, at 12-14; Def's Reply Memo in Support, Dkt. 122, at 3-6.) In his deposition by the government, Carr testified that between 1999 and 2003, he was running the operation on his own and that he was responsible for signing paychecks and supervising operations. (Def's 56.1(a)(3), Dkt. 93, ¶ 18, Ex. A, Carr Dep., at 16-19.) Carr also testified that he did not think Defendant held a position at that time and that he did not recall Defendant ever operating the plating line or the wastewater treatment system. (*Id.* ¶¶ 20-21.) According to Defendant, his only involvement with Crescent Plating between 2001 and 2003 was loaning the operation money to keep it functioning and receiving lease payments on his equipment so that he could recoup the money that he had loaned to his then-deceased cousin. (*Id.* ¶ 10.)

That testimony about Defendant's 2001-2003 involvement at Crescent Plating is disputed. For example, when the owners of the neighboring building and their lawyer corresponded with Crescent Plating about chemical seepage, they corresponded with Defendant. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, Supp ¶¶ 34-36.) One of those correspondences, a memo from Defendant to the neighbors' lawyer, identifies Defendant as "General Manager & CEO" of Crescent Plating (*Id.*, Ex. 61.) In his deposition, Defendant denied any knowledge of the correspondence. (Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, Supp ¶¶ 35-36.) There is other evidence of Defendant's involvement in the operation: he met with various environmental inspectors throughout 2003 and he requested a quote from a service that

could dispose of Crescent Plating's waste in October 2003. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, Supp ¶¶ 8-13.) Defendant insists that his practice of meeting with inspectors does not necessarily mean that he had responsibility for pollution control and that he sought the quote only because of Carr's bad reputation with disposal companies. (Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, Supp ¶¶ 8-13.) Maybe so, but a jury need not agree. That is, the government has presented evidence from which a reasonable jury could find that Defendant had a sufficient connection to Crescent Plating's pollution control efforts that he was an operator between 2001 and 2003. *Bestfoods*, 524 U.S. at 66-67.

The government's evidence that Defendant was an operator between 1997 and 1999 is even stronger, but it too is contested. First, there is Defendant's admission: in the complaint he filed against Crescent Plating, Defendant certified that he "possessed complete control over the operation and management" of Crescent Plating from 1997 to 1999. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, ¶ 9, Ex. 8, ¶ 19.) Defendant now denies that he was ever able to exercise that power. (Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, ¶ 9.) Nevertheless, Defendant's signature appears on numerous compliance reports submitted to the Metropolitan Water Reclamation District of Greater Chicago, filed during this time period. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, Supp ¶ 2.) Defendant denies that he actually signed those documents; without explaining what motive someone may have had for forging his signature, he testified that misuse of his signature was common at Crescent Plating. (Def's Reply Memo in Support, Dkt. 122, Attachment 1, Ex. A, Saporito Dep., at 195.) An FBI handwriting analysis was inconclusive. (Def's Reply to Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 123, Supp. ¶ 2, Ex. 6.) Finally, an employee of Crescent Plating stated that Defendant had responsibility for filing all environmental regulatory paperwork. (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, ¶ 10.) Defendant insists that even if all of the government's evidence is credited, it does not show that he had any actual authority at Crescent Plating. (Def's Reply Memo in Support, Dkt. 122,

13

at 5-6.)  Indeed, a jury could believe that the signatures on the forms are not Defendant's or that he merely signed documents prepared by others and had no actual control over operations, but a jury could also find that the evidence shows that, from 1997 to 1999, Defendant managed, directed, or conducted operations related to pollution, and was, therefore, an "operator" under CERCLA. *Bestfoods*, 524 U.S. at 66-67.  Again, Defendant has not shown that he is entitled to summary judgment on this issue.

Defendant next argues that even assuming that he was an operator, the government's evidence is not sufficient to show that there was a disposal of a hazardous substance during the time that he was an operator.  (Def's Reply Memo in Support, Dkt. 122, at 9-11.)  The government has presented evidence of spills at Crescent Plating, (Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, Supp. ¶¶ 19, 25-26), and "spilling" is included in the definition of "disposal."  42 U.S.C. § 6903(3).  Defendant does not disagree, but, relying on the Seventh Circuit's opinion in *Sycamore Indus. Park Associates v. Ericsson, Inc.*, 546 F.3d 847 (7th Cir. 2008), argues that those spills were not a disposal because there was no risk of them leaving the facility.  (Def's Reply Memo in Support, Dkt. 122, at 2-3.)  Whether there was such a risk, though, is a disputed question of fact. The government presented evidence that the concrete floor at Crescent Plating was corroded to the point that soil was exposed, both in 1997 and in 2003.  (Pl's 56.1(a)(3), Dkt. 87, ¶ 40; Pl's 56.1(b)(3) Response to Def's 56.1(a)(3), Dkt. 108, Supp. ¶ 22.)  Thus, in contrast to *Sycamore* where there was no danger of the asbestos leaving the building and entering the environment, *Sycamore Indus. Park Associates*, 546 F.3d at 851, a jury could find that the hazardous waste here was coming into direct contact with bare soil.

Finally, Defendant argues that he cannot be liable as a past operator because even crediting the evidence of disposal, the government has not presented evidence establishing a connection between that disposal and the EPA's cleanup of the site.  (Def's Memo in Support, Dkt. 92, at 11-12; Def's Reply Memo in Support, Dkt. 122, at 12-13.)  This argument fails because

CERCLA has no such causation requirement. CERCLA creates a strict-liability regime that assumes a connection between the disposal made during the period that the defendant operated the facility and the later cleanup of the facility.[2] *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 603 (2nd Cir. 1999) ("It is not a defense that the particular hazardous substance attributable to a specific defendant is not linked to the plaintiff's response costs.") Thus, whether Defendant is a responsible party under CERCLA as a past operator of Crescent Plating is a disputed question of fact.

### 2. Responsible Party—Current Owner

The government's motion for summary judgment relies on its argument that Defendant was a facility owner at the time of the cleanup based on his undisputed ownership of equipment used in the plating process. Although Defendant contests the meaning of his statement that the equipment he owned was the "heartbeat" of Crescent Plating's business, (Pl's 56.1(a)(3), Dkt. 87, Ex. 22, Saporito Dep., at 435; Def's Memo in Opposition, Dkt. 110, Ex. 1 ¶ 13.), there is no dispute that the equipment was at least a necessary part of the plating process.

To argue that he is not a responsible party despite his ownership of equipment used at Crescent Plating, Defendant asserts that the government has not offered evidence connecting that equipment to any release or threatened release or to any cleanup costs. (Def. Saporito's Memo in Opposition, Dkt. 110, at 10-11.) Again, however, the CERCLA statute requires no such connection. "CERCLA is a strict liability statute. Liability is imposed when a party is found to have a statutorily defined 'connection' with the facility; that connection makes the party responsible regardless of causation." *United States v. Capital Tax Corp.*, 545 F.3d 525, 530 (7th Cir. 2008) (citation omitted). Thus, if Defendant is an "owner" within the terms of CERCLA, he is liable. The government need not present evidence showing that any specific piece of equipment he owned was

---

[2]    Of course, that regime may be tempered somewhat by apportionment, *see Burlington Northern & Santa Fe R.R. Co. v. United States*, 129 S. Ct. 1870 (2009), which is discussed below.

responsible for specific releases of hazardous chemicals or specific cleanup costs.

Defendant next argues that one who leases equipment to an independent party that uses the equipment to cause pollution is not liable as an owner under CERCLA. (Def's Memo in Opposition, Dkt. 110, at 11.) In support of its argument to the contrary, the government relies on a case in which a pesticide manufacturer sought contribution from the United States for the costs of cleanup at a DDT factory. In that case, the government conceded that because it "owned and leased the components most important to" the operator's process, it was an owner under CERCLA. *Elf Atochem North American, Inc. v. United States*, 868 F.Supp. 707, 709 (E.D. Pa. 1994). The concession in *Elf Atochem*, which the court relied on to hold the United States liable, comports with the ordinary meaning of "owner"[3] and is supported by the common law.

The plating line is no less a facility than the land on which it operated. 42 U.S.C. § 9601(9)(A). Thus, an owner of equipment necessary to the operation of the plating line is no less an "owner" than a part-owner of land. *United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1279-80 (3d Cir. 1993), *overruled on other grounds by United States v. E.I. Dupont De Nemours & Co.*, 432 F.3d 161 (3d Cir. 2005) (owner of less than 10% of facility treated as "owner" under CERCLA). Just as CERCLA extends liability to a landowner who may not even be aware of pollution-producing activities by a lessee, *e.g., United States v. Monsanto Co.*, 858 F.2d 160, 168 (4th Cir. 1988), it also extends liability to an equipment owner like Defendant whose lessee is using the equipment in a similar manner. In fact, the equipment owner is arguably more culpable: a landowner might not inquire into how her land is being used, but an equipment owner is likely to know exactly what her equipment can do.

Defendant argues that the government's theory of owner liability sweeps too broadly. The government's theory, Defendant warns, would make the power company a responsible party

---

[3]    "One who has the right to possess, use, and convey something." BLACK'S LAW DICTIONARY (8th ed. 2004.)

because it owns the electricity and power lines necessary to run the plating line.  (Def. Saporito's Memo in Opposition, Dkt. 110, at 11 n.2.)  The city, too, would be liable under this approach, Defendant argues, because it owns the water pipes necessary to provide water for the process.  (*Id.*)  The court agrees with Defendant that holding these parties liable would be absurd, but does not share Defendant's concern that the government's theory leads to this result.  Defendant's equipment is similar to the power lines or water pipes in that it is necessary for the electroplating process, but under a common understanding of the word "owner," the power company and the city are not owners of the plating line.  Defendant, though, because he owned *actual components* of the plating line, is an owner.

If the court concludes he is an owner, Defendant raises an alternative defense: that he is entitled to CERCLA's exception for owners who are protecting a security interest.  (Def's Memo in Opposition, Dkt. 110, at 13.)  CERCLA § 101(20)(A), 42 U.S.C. § 9601(20)(A), excludes from the definition of owner "a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility."   The exception's purpose "is to shield from liability those 'owners' who are in essence lenders holding title to the property as security for the debt."  *Waterville Industries, Inc. v. Finance Authority of Maine*, 984 F.2d 549, 552 (1st Cir. 1993).

The court does not believe the exception applies here.  First, the exception would require a finding that Defendant did not participate in the management of Crescent Plating and that the loan he purportedly made to his cousin created a security interest—findings that are inconsistent with much of the evidence.  Even assuming Defendant can make those showings, however, the exception does not apply because Defendant has not presented sufficient evidence from which a jury could find that he owned the equipment "primarily to protect" a security interest.  *Capital Tax Corp.*, 545 F.3d at 531 (party asserting "security interest" exclusion bears burden of establishing it).  Defendant paid $10,000 for the equipment, and neither the contract for its sale nor the contract

17

for leasing it back makes any reference to the loan. (Pl's 56.1(a)(3), Dkt. 87, Ex. 25, 26.) Defendant has stated that his purchase and leasing of the equipment was "part of his efforts to get his money back," but no evidence supports his argument that he owned the equipment "primarily to protect" a security interest. In his brief, Defendant states that the lease was "expressly designed for the purpose of recovering and protecting his clear security interest in the unpaid $100,000 loan," but he presents no supporting evidence. (Def's Memo in Opposition, Dkt. 110, at 13.) Aside from his testimony on the existence of the loan, Defendant presents no evidence that would set him apart from someone who was not previously associated with Crescent Plating but who purchased the equipment for $10,000 and leased it back to Crescent. That person could not benefit from the exception; neither can Defendant. For all these reasons, the court finds it undisputed that Defendant is an "owner" under CERCLA.

### 3.       Release or a threatened release of a hazardous substance

Defendant's first argument on this element is that the government has not produced any evidence showing that the chemicals in question were "hazardous." (Def's Memo in Opposition, Dkt. 110, at 2-4.) His argument is that the government has not shown that the substances in question could cause an imminent and substantial danger to public health. Again, Defendant is arguing that the government must meet an obligation that the CERCLA statute itself does not impose. Under CERCLA 101(14)(A), 42 U.S.C. § 9601(14)(A), the term "hazardous substance" covers any substance designated under 33 U.S.C. § 1321(b)(2)(A). And under that provision, the EPA has designated numerous substances found at the Crescent Plating site, including cadmium, chromic acid, chromium, copper, cyanide, mercury, nickel, zinc, and wastewater treatment sludge. 40 C.F.R. §§ 261.20-24, 261.31, 302.4. Before so designating a substance, the EPA must find that it presents "an imminent and substantial danger," 33 U.S.C. § 1321(b)(2)(A), but requiring the government to support that finding in *every* enforcement action would make little sense. There would be no value in identifying substances in the federal code as hazardous if the government

were nevertheless required to prove the danger in every enforcement action. Defendant's argument to the contrary relies on selectively quoting from § 1321(b)(2)(A) in such a way that hides the involvement of the EPA's rulemaking function. There is no genuine dispute here; chemicals found at the site have been designated as hazardous by the EPA.

Next, Defendant argues that the government's evidence does not show a release or threatened release of a hazardous substance. (Def's Memo in Opposition, Dkt. 110, at 5-9.) CERCLA defines "release" very broadly to include "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)."[4] 42 U.S.C. § 9601(22). The government's evidence on this element is ample: at the time of the cleanup, the Crescent Plating building held hundreds of vats and drums full of hazardous chemicals, some of those containers were corroded, and the facility was covered with dried sludge and plating waste. (Pl's 56.1(a)(3), Dkt. 87, ¶¶ 64-69.) The building itself had no heat or electricity as winter approached, and its sorry condition included cracks in the floor that could have allowed the hazardous substances to enter the soil. (*Id.* ¶¶ 64, 67.) Though Defendant emphasizes that the tests do not show exactly what occurred, it is undisputed that hazardous chemicals did enter the soil. (Pl's 56.1(a)(3), Dkt. 87, ¶¶ 54-55; Def's 56.1(b)(3) Response to Pl's 56.1(a)(3), Dkt. 111, ¶¶ 54-55.)

Rather than offer anything that would contradict the government's evidence on the threat posed by Crescent Plating's condition, Defendant argues that the EPA reports that constitute the government's evidence on this issue are inadmissible. (Def's Memo in Opposition, Dkt. 110, at 6.)

---

[4] Excluded from the definition of release is "any release which results in exposure to persons solely within a workplace, *with respect to a claim which such persons may assert against the employer of such persons.*" 42 U.S.C. § 9601(22)(A) (emphasis added). No claim by a person against her employer is at issue in this case, yet Defendant seeks to rely on the exclusion by ignoring the emphasized text. (Def's Memo in Support, Dkt. 92, at 10; Def's Memo in Opposition, Dkt. 110, at 12.) Argument by elision is not a favored tactic.

As explained above, that evidence falls under the hearsay exception for official reports. Moreover, most of the information in those reports is based on personal knowledge, so it is not hearsay at all. And, for the reasons explained earlier, the court is not persuaded by Defendant's argument that the government's evidence must be excluded as untimely expert testimony.

On this record, it is undisputed that thousands of gallons of hazardous waste were being stored unsafely in a building with a deteriorating concrete floor. That is sufficient to show a threatened release of hazardous waste. *Amland Properties Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784, 793 (D.N.J. 1989) (holding that the presence of hazardous chemicals in a concrete floor constituted a threatened release because there was a danger of the chemicals leaching through the concrete into the earth below).[5] Defendant points to cases where courts have held that hazardous material stored within a secure building is not released or threatening a release under CERCLA, *e.g., Sycamore Indus. Park Associates v. Ericsson, Inc.*, 546 F.3d 847, 852-53 (7th Cir. 2008)*; G. J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 385 (7th Cir. 1995), but those cases are readily distinguishable based on the undisputed evidence of the deteriorating state of Crescent Plating's floor at the time of the cleanup. Thus, the government has established that there was a threatened release at the time of cleanup.

**4.    Costs Incurred in Response to the Release or Threatened Release**

Defendant argues that he cannot be liable for the government cleanup because the cleanup was not tied to any actual release. (Def's Memo in Support, Dkt. 92, at 8-10; Def's Memo in Opposition, Dkt. 110, at 7-9.) Assuming that hazardous substances were released into the soil, Defendant argues, he has no liability because the government did not remediate the soil. This

---

[5]    Defendant argues to the contrary, citing *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir. 1985), but that case hardly bolsters his position. (Def's Memo in Opposition, Dkt. 110, at 6.) The Second Circuit held that "the corroding and deteriorating tanks, Shore's lack of expertise in handling hazardous waste, and even the failure to license the facility, amount to a threat of release." *Shore Realty Corp*, 759 F.2d at 1045. That is exactly the opposite of how Defendant characterizes the holding.

argument ignores the government's undisputed evidence, discussed above, that the material it cleaned up was *threatening* a release. Moreover, it is wrong as a matter of law. To reiterate: causation need not be proven under CERCLA. *United States v. Capital Tax Corp.*, 545 F.3d 525, 530 (7th Cir. 2008). As the Eighth Circuit has explained, "once the requisite connection between the defendant and a hazardous waste site has been established (because the defendant fits into one of the four categories of responsible parties), it is enough that response costs resulted from 'a' release or threatened release—not necessarily the defendant's release or threatened release." *United States v. Hercules, Inc.,* 247 F.3d 706, 716 (8th Cir. 2001) (citing 42 U.S.C. § 9607(a)(4)); *accord Town of Munster v. Sherwin-Williams Co.*, 27 F.3d 1268, 1273 n.3 (7th Cir. 1994) (collecting cases). Beyond his misguided causation argument, Defendant does not dispute that the government spent $1.5 million to clean up the Crescent Plating facility. Thus, the government has established that it incurred costs in response to a threatened release.

**5. Defenses**

Defendant also attempts to escape liability by relying on several defenses. Two of those defenses—that the releases were in the workplace and that Defendant is not an owner because he was protecting a security interest—have already been addressed. The remaining defenses fare no better, as explained below.

**a. Third-Party Defense**

First, Defendant attempts to rely on CERCLA's third-party defense. 42 U.S.C. § 9607(b)(3). The defense applies if a party shows, by a preponderance of the evidence, that "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by . . . an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant," provided that (a) the defendant "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably

result from such acts or omissions," and (b) the defendant "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances." *Id.* In support of this argument Defendant argues that his contractual relationship with Crescent Plating did not relate to hazardous substances, it did not give him any control over Crescent Plating's activities, and the lease document itself specifically stated that Crescent Plating would use the equipment lawfully. (Def's Memo in Opposition, Dkt. 110, at 12-13.)

The third-party defense is not available to Defendant because, first, his contractual relationship with Crescent Plating *was* connected to the release of a hazardous substance. Defendant's lease agreement with Crescent Plating states that the equipment being leased will be used "in the performance of accomplishing metal finishing work in an authorized and lawful fashion." (Pl's 56.1(a)(3), Dkt. 87, Ex. 26 ¶ 2.) The first part of this statement—"in the performance of accomplishing metal finishing work"—leaves no doubt that the contract was connected to the release; the release was caused by the plating process, an object of the contract. *See Westwood Pharmaceuticals, Inc. v. Nat'l Fuel Gas Distribution Corp.*, 964 F.2d 85, 91-92 (2d Cir. 1992); *American Nat'l Bank & Trust Co. v. Harcros Chemicals, Inc.*, 997 F.Supp. 994, 1001 (N.D. Ill. 1998). Some courts have interpreted "in connection with a contractual relationship" such that the third-party defense does not apply when there is *any* contractual relationship between the defendant and the third party that caused the release. *E.g., United States v. Domenic Lombardi Realty, Inc.*, 204 F. Supp. 2d 318, 332 (D.R.I. 2002). Under either interpretation, then, Defendant cannot benefit from the defense.

Defendant's third-party defense also fails because he has not presented evidence that he "exercised due care with respect to the hazardous substance concerned." 42 U.S.C. § 9607(b)(3). The only evidence that Defendant identifies on the issue are three conditions of the lease of the equipment that require Crescent Plating to use the equipment "in an authorized and lawful fashion,"

to "maintain any and all license fees and/or registrations as may be required to facilitate operations in the State of Illinois," and to "comply with any and all ordinances and statutes established by municipal, state and federal authorities and/or agencies." (Pl's 56.1(a)(3), Dkt. 87, Ex. 26 ¶¶ 2-3, 6.) According to Defendant, the Second Circuit held that a similar provision was evidence of due care in *New York v. Lashins Arcade Co.*, 91 F.3d 353 (2d Cir. 1996). The defendant-landowner in *Lashins* included in its lease an instruction to tenants not to discharge hazardous substances into the waste and septic systems, but the lease language was not the only evidence of due care in that case. The defendant also "conducted periodic inspections to assure compliance with this obligation," regularly had water samples from the site analyzed, and, perhaps most importantly, did not become the site's owner until after the cleanup of the site began. *Id.* at 361-62, 361 n.6. In contrast, Defendant owned the equipment when it was involved in creating hazardous waste and beyond the contractual provisions requiring compliance with the law, he has not identified any evidence that he monitored Crescent Plating's conduct. The goals of CERCLA would not be advanced by a holding that an equipment owner exercises due care merely by including a provision in the equipment lease requiring the equipment user to comply with the law. *Id.* at 361.

### b. Apportionment

Next, Defendant argues that even if he is liable for removal of hazardous waste, the liability should be apportioned in such a way that his share is *de minimis.* (Def's Memo in Support, Dkt. 92, at 15; Def's Memo in Opposition, Dkt. 110, at 13-14; Def's Reply Memo in Support, Dkt. 122, at 11-16.) The court granted the parties' joint motion to bifurcate, (Order of Dec. 2, 2008, Dkt. 60), so the precise amount of any award is not at issue at this stage. Nevertheless, how liability is apportioned is at issue because the government seeks to hold Defendant jointly and severally liable for all costs associated with the cleanup. (Pl's Memo in Support, Dkt. 86, at 1.) On the question of apportionment, CERCLA incorporates common law rules: "apportionment is proper when 'there is a reasonable basis for determining the contribution of each cause to a single harm.'" *Burlington*

*Northern & Santa Fe R.R. Co. v. United States*, 129 S. Ct. 1870, 1881 (2009) (*quoting* RESTATEMENT (SECOND) OF TORTS § 433A(1)(b) (1979)). A CERCLA defendant has the burden of showing that apportionment is proper in order to avoid joint and several liability. *Id.* And whether apportionment is proper is a question of law. *Chem-Nuclear Systems, Inc. v. Bush*, 292 F.3d 254, 260 (D.C. Cir. 2002) (*citing In re Bell Petroleum*, 3 F.3d 889, 896 (5th Cir. 1993)).

Defendant has not carried his burden of showing that liability should be apportioned with regard to his status as a current owner. Apportionment based on the disputed issue of Defendant's status as an operator might be appropriate, but cannot be resolved because the issue is disputed. As explained by the section of the Restatement quoted by the Supreme Court in *Burlington Northern*, when there is a single harm, apportionment is appropriate only if there are multiple causes. RESTATEMENT (SECOND) OF TORTS § 433A(1)(b) (1979). That was the case in *Burlington Northern* where the contamination of a total site could be divided among spills that occurred on adjoining parcels of land owned by different parties. *Burlington Northern*, 129 S. Ct. at 1882-83; *accord Capital Tax Corp.*, 545 F.3d at 535 ("One method of creating a reasonable estimate of damages is to show that the contamination at the facility is geographically divisible."). Here though, there is only one cause: the plating process itself. Ownership of the equipment necessary for that process is divided, but not in the way that ownership was divided among owners of separate parcels of land in *Burlington Northern.* As the Second Circuit has explained, "where each tortfeasor causes a single indivisible harm, then damages are not apportioned and each is liable in damages for the entire harm." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2nd Cir. 1993). Rather than being comparable to the owner of a parcel that makes up one section of a facility, Defendant's ownership of some of the equipment necessary to the plating process makes him comparable to a joint venturer. And apportionment is not appropriate for joint venturers. RESTATEMENT (SECOND) OF TORTS § 876 (1979).

Even assuming that apportionment is possible among co-owners of components that

together make up a single process, Defendant has not carried his burden of proving an apportionment theory by a preponderance of the evidence. *Burlington Northern*, 129 S. Ct. at 1881; *Chem Nuclear Systems, Inc.*, 292 F.3d at 259-61. Defendant suggests that because the rectifiers were not capable of producing waste on their own, he should be apportioned no liability for owning them. (Def's Memo in Opposition, Dkt. 110, at 13-14.) It is undisputed that the rectifiers were a necessary part of the plating process, so they must be responsible for *some* amount of the waste that the process produced. Aside from zero, Defendant suggests no other possible proportion. Defendant also points out that his filter press could hold only around 400 gallons of waste at a time, a tiny fraction of the hundreds of thousands of gallons of waste removed. (Def's Memo in Opposition, Dkt. 110, at 13-14.) Defendant does not argue that the filter press had no connection to the production of waste not stored in the press at the time of cleanup, though. Like the rectifiers, the filter press was a part of the plating process, and Defendant has not presented any theory for computing its proportion of liability aside from saying it is zero. Without any such theory for measuring the waste produced by his equipment, Defendant's apportionment argument must fail.

Finally, Defendant argues that he should not be responsible for waste dumped into the soil decades before the cleanup. (Def's Reply Memo in Support, Dkt. 122, at 12.) Since the government's cleanup costs involved cleaning up the inside of the facility and not the soil, this apportionment theory is a nonstarter.

### c. Government Conduct

Defendant's final defense to liability is his assertion that the government's conduct toward him was "well outside the reasonable metes and bounds of not only what CERCLA was designed to do, but outside the metes and bounds of Saporito's constitutional protections as well." (Def's Memo in Opposition, Dkt. 110, at 14-15.) This is an "unclean hands" defense, and it is not permitted under CERCLA. *Town of Munster v. Sherwin-Williams Co.*, 27 F.3d 1268, 1270 (7th Cir.

1994); *see also California ex rel. California Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 672 (9th Cir. 2004) (collecting cases).

The only support that Defendant provides for his bad-government-conduct defense is the Seventh Circuit's opinion in *United States v. Tarkowski*, 248 F.3d 596 (7th Cir. 2001), which affirmed the denial of the EPA's request for an order allowing it to access and perform whatever remediation it deemed necessary on a property where only trace amounts of contaminants had been found. The facts of this case are quite different from *Tarkowski* where the EPA claimed "a right to undertake remedial efforts before determining whether there is a hazard that justifies the efforts." *Id.* at 601. Here, the government seeks neither an access order nor a remediation order, and, as the court has already found, it is undisputed that the Crescent Plating site contained vast quantities of hazardous substances threatening a release. Like Defendant's other proposed defenses to liability, this one fails.

Because undisputed evidence establishes all four elements of the CERCLA claim based on Defendant's status as a current owner, and because Defendant has not presented any viable defenses to that claim, Plaintiff's motion for summary judgment in part is granted. Defendant's motion for summary judgment on his liability as a past operator is denied.

**B.    Plaintiff's Motion to Dismiss Defendant's Counterclaims**

Defendant answered the government's complaint with six counterclaims of his own. In each of the first five counterclaims, Defendant seeks a declaration that he is not liable to and owes no damages to the government as well as an injunction preventing further action against him in connection with the Crescent Plating site. (Answer to Plaintiff's First Amendment Complaint, Dkt. 104, at 30-32.) Counterclaim One alleges that Defendant is not a responsible party under CERCLA. (*Id.,* Counterclaims ¶¶ 44-49.) Counterclaim Two suggests that Defendant is immunized from liability under CERCLA, but does so only by alleging that there is a "present, genuine, and justiciable controversy" over Defendant's immunity claim. (*Id.,* Counterclaims ¶¶ 50-54.) Defendant

has not explained what type of immunity he is referring to; perhaps he means that he is immune from liability based on the defenses he asserted in his opposition to the government's motion for summary judgment. Counterclaims Three, Four, and Five contain similar allegations that there are disputes regarding, respectively, whether the government exceeded its statutory authority, whether that statutory authority is constitutional, and whether the government violated Defendant's constitutional rights. (*Id.,* Counterclaims ¶¶ 55-69.) In Counterclaim Six, Defendant alleges a controversy over whether the government took his property illegally and without compensation. (*Id.,* Counterclaims ¶¶ 70-72.) Counterclaim Six seeks damages for that taking; it is the only counterclaim that seeks a remedy beyond what Defendant would be entitled to if he prevailed on the claims brought by the government against him.

The government argues that Defendant's first five counterclaims must be dismissed for failure to state a claim upon which relief may be granted. (Pl's Memo in Support of Dismissing Counterclaims, Dkt. 83, at 10-13.) As an initial matter, the court does not understand why Defendant has chosen to include Counterclaims One through Five as counterclaims. They appear to be defenses, and, in fact, may be included in Defendant's list of 27 defenses. (Answer to Plaintiff's First Amendment Complaint, Dkt. 104, at 18-23.) As relief, those counterclaims seeks a declaration that Defendant owes no liability or damages to the government as well as an injunction preventing further government action against Defendant. Defendant insists that the court can rule on what are in effect defenses to CERCLA liability under the Declaratory Judgment Act, 28 U.S.C. § 2201. (Def's Memo in Opposition to Pl's Mot. to Dismiss, Dkt. 109, at 10-11.)

The Declaratory Judgment Act allows a party to bring a lawsuit based on a reasonable apprehension that it will be sued. *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 741 (7th Cir. 2009). It is not, however, a vehicle for bringing counterclaims to a suit that has already been filed when those counterclaims mirror defenses already raised. "'It is well settled that such repetitious and unnecessary pleadings should be stricken.'" *United States v. Zanfei*, 353 F. Supp. 2d 962, 965

(N.D. Ill. 2005) (*quoting Rayman v. Peoples Savings Corp.*, 735 F. Supp. 842, 851-52 (N.D. Ill. 1990)); *see also Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir. 1985). Moreover, the facts pleaded in support of Counterclaims One through Five are so sketchy and conclusory that they would almost surely be dismissed for failing to contain the required "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Accordingly, Claims One through Five are dismissed..

The government next argues that Counterclaim Six must be dismissed for a lack of subject matter jurisdiction. Counterclaim Six seeks damages from the government for the unlawful taking of Defendant's property. A takings claim against the Federal Government that seeks more than $10,000 in damages must be brought under the Tucker Act, 28 U.S.C. § 1491(a)(1), in the Court of Federal Claims. *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 11-12 (1990). Defendant argues that under certain theories of liability, which he has not developed, the damages he seeks *might* be less than $10,000. (Def's Memo in Opposition to Dismissing Counterclaims, Dkt. 109, at 6-7.) Whatever method Defendant has for valuing his equipment may have some relevance to determining the potential damage amount, but Defendant has not explained why his undisclosed methodology should trump the undisputed evidence—both his own testimony and the bill of sale—that he initially paid $10,000 for the equipment as well as $30,000 to $40,000 more for it over time. (Pl's 56.1(a)(3), Dkt. 87, Ex. 25, Ex. 2, Saporito Dep., at 233-34.) The court finds that Counterclaim Six seeks damages in excess of $10,000, so it is dismissed for lack of jurisdiction. In any event, based on the court's grant of summary judgment to the government on the underlying CERCLA claim, this counterclaim would be meritless.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment [85] is granted as to Defendant Saporito, Defendant Saporito's Motion for Summary Judgment [91] is denied, and

Plaintiff's Motion to Dismiss Defendant Saporito's Counterclaims is granted [82].

ENTER:

Dated: February 9, 2010

_____
REBECCA R. PALLMEYER
United States District Judge